[Civil No. 3449.   Filed November 27, 1934.]

[38 Pac. (2d) 631.]

STATE TAX COMMISSION and STATE BOARD OF EQUALIZATION OF THE STATE OF ARIZONA; M. A. MURPHY, FRANK LUKE and THAD M. MOORE, Members of Said Commission and Board, Appellants, v. SPENCER S. SHATTUCK and W. F. HOLWAY, Appellees.

Appellants Same as in Cause No. 3449, v. GEORGE KINGDON, Appellee.

[Civil No. 3448.]

Mr. Arthur T. La Prade, Attorney General, and Mr. Charles L. Strouss, Assistant Attorney General, for Appellants.

Messrs. Sutter & Gentry, Messrs. Cornick & Crable, and Mr. Martin Gentry, for Appellees.

Messrs. Favour & Baker, Mr. A. H. Favour, Mr. A. G. Baker and Mr. A. M. Crawford, *Amici Curiae.*

ROSS, C. J.—The purpose of these two suits is the same, and for that reason they have been presented, argued, and submitted together. They seek to enjoin the state tax commission from assessing and taxing the plaintiffs' intangible property under the provisions of "the Intangible Property Tax Act of 1933" (Laws 1933 [1st Sp. Sess.], chap. 16), the said commission being the body named to administer the act, for the reason, as they assert, that the said act in many of its provisions violates the state and federal Constitutions, and is so uncertain, unintelligible and indefinite as to be incapable of interpretation or construction.

Both parties made motions for judgment on the pleadings, which consisted of the complaint and

answer. The motion of plaintiffs was granted, and, the defendants electing to stand on their answer, judgment was entered in favor of plaintiffs as prayed, from which judgment the defendants have appealed.

The contention of the appellants is that the Intangible Property Tax Act is a valid piece of legislation and capable of enforcement, whereas the appellees contend that, for all the reasons set out in their complaint, and for others, it is invalid and unenforceable. The question involved is the sufficiency of the complaint to state a cause of action for injunction against the enforcement of the act. We think the motion by the defendants for judgment on the pleadings, under the circumstances, served the same purpose as a general demurrer. Therefore, if the complaint, for the reasons therein assigned, is good, whether it be the reason or reasons upon which the trial court based its decision or not, it to that extent states a cause for equitable relief.

Those provisions of the act, the validity of which the complaint challenges, we will consider in the order hereinafter followed. We wish first, however, to observe that, until the Intangible Property Tax Act, being chapter 16, First Special Session of the Eleventh Legislature, Laws of 1933, was passed, all property, tangible and intangible, with certain constitutional exemptions, was taxed upon an *ad valorem* basis at its full cash value. Sections 3066, 3067 and 3068, Rev. Code 1928. However, in the practical administration of the law, either because of the difficulty of locating it or the indifference of assessing officers, intangibles were not often or ever assessed. Tangible property, being easily located, was made to bear all the tax burden. The Intangible Property Tax Act was passed to correct this unjust and unfair discrimination and to make each class bear a fair

proportion of the property tax. With the wisdom or unwisdom of the law the court has nothing to do. Its duty is confined to a determination of the power of the legislature to enact the law in its present form and its proper interpretation or construction.

1. It is said that the state Constitution, sections 3 and 9 of article 9, provides that every law imposing a tax shall distinctly state the tax and the objects to which it shall be applied, and that the Intangible Property Tax Act fails to do that, and is therefore void. The pertinent part of section 3 reads:

"No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the tax, to which object only it shall be applied."

Section 9 reads:

"Every law which imposes, continues, or revives a tax shall distinctly state the tax and the objects for which it shall be applied; and it shall not be sufficient to refer to any other law to fix such tax or object."

Section 3 of the Intangible Tax Act defines the object of the tax to be "to assist in defraying the cost of maintenance of the state government, and to lessen the burden in this regard resting upon tangible property," and provides that the tax shall be paid into the state treasury to the credit of the general fund and applied on appropriations for the maintenance of the state government. The object of the tax as here stated is as general as the purposes for which taxes may be imposed to support the state government. In a revenue bill such as this one, it would be impracticable, if not impossible, more definitely to state the object or objects for which the tax is imposed or levied. Cooley on Taxation, 4th ed., vol. 2, § 500, in discussing constitutional provisions requiring the object of the tax to be stated in the law, says:

"But the purposes of government are so infinite in variety that the specification must for the most part be very general, or the constitution could not be complied with; and it has been held that a statement in a tax law, that the money to be raised is to be paid into the treasury to the credit of the general fund, is a sufficient compliance with the requirement."

This text finds support in the following cases: *People* v. *Supervisors of Orange County,* 17 N. Y. 235; *People* v. *Home Ins. Co.,* 92 N. Y. 328; *In re Gross Production Tax of Wolverine Oil Co.,* 53 Okl. 24, 154 Pac. 362, L. R. A. 1916F 141; *Westinghausen* v. *People,* 44 Mich. 265, 6 N. W. 641; *Hillman Land & Iron Co.* v. *Commonwealth,* 148 Ky. 331, 146 S. W. 776, L. R. A. 1915C 929; *People* v. *New York, C. & St. L. R. Co.,* 353 Ill. 518, 187 N. E. 443.

The law involved in *People* v. *Supervisors of Orange County, supra,* provided that the money to be raised should be paid into the treasury of the state, to the credit of the general fund, and this was held a sufficient statement of the object of the tax. The court's reasoning, in part, is as follows:

"The only question is whether the object of the tax is also sufficiently stated. I think it is. The rate of taxation is stated. To state the amount which the tax would produce was of course impossible. This amount, whatever upon the collection of the tax it may prove to be, is not only to be paid into the treasury, but is to be credited to that fund whose office it is to support the state government. Suppose the legislature, instead of merely declaring the general object to which the amount raised by the tax should be devoted, had attempted to accommodate its action to the construction of the constitution for which the defendants now contend, and had not only declared the object of the tax, as it has done, but had gone on to appropriate it as well as it might without knowing what amount would be raised, what would have been the result? Suppose it had been declared in the law, as it was suggested by the distinguished

counsel who represented the defendants upon the argument it should have declared, that the money to be raised by the tax should be appropriated to the payment of the salaries of the judiciary, and the expenses of the executive and legislative departments of the government, what then would have been effected more than has now been done? The taxpayers would then have learned, as they now learn, that the general fund was deemed insufficient to defray the expenses of the government and that it was necessary to increase its revenues by taxation. The tax to be collected under such a law would, as under the law in question, be paid into the general fund and would be appropriated as now to the payment of the expenses chargeable upon that fund. In short, the object of the tax in that case would not appear any more distinctly than it now appears. All that could be said in such a case in respect to the object of the law would be, that in the judgment of the legislature, the fund charged with the payment of the expenses of the government needed to be replenished by taxation. This object appears distinctly upon the face of the present law."

We should remember that:

"Every presumption and intendment is in favor of the constitutionality of the act, and the courts will not adopt a doubtful construction to nullify it. . . . Whenever an act of the legislature can be construed so as to give it effect and avoid a conflict with a constitutional provision, the court will give it such construction." *People* v. *Gilroy,* 9 N. Y. Supp. 686, 688.

In holding that the Intangible Property Tax Law states the object of the tax with sufficient definiteness to comply with the requirements of sections 3 and 9 of article 9 of the Constitution, we have not departed from the rule laid down in *Tillotson* v. *Frohmiller,* 34 Ariz. 394, 271 Pac. 867. A reading of that case will show that the law not only failed to state the object of the tax but that it delegated to the board of

directors of state institutions the legislative power of selecting such object.

2. Appellees assert that the power of the legislature to provide taxes is limited by section 3 of article 9 of the Constitution to an annual tax sufficient, with other sources of revenue, to defray the necessary ordinary expenses of the state for each fiscal year; and that the Intangible Tax Act violates such provision by providing for a continuing, recurrent, annual *ad valorem* tax at the same rate each year, regardless of the needs of the state. It is true the tangible property of the state is revalued each year and that the rate thereon is fixed each year so as to meet, with other sources of revenue, legislative appropriations. Because of its nature, intangible property for taxation purposes has been put into a different class. The power of the legislature to do this is found in section 1 of article 9 of the Constitution, and by section 11 of said article the manner, method and mode of assessing, equalizing, and levying taxes is reposed in the legislature. As in the case of tangible property, the value of intangible property is fixed each year. It is levied and collected each year. The only difference is that the rate is continuing, and there is no suggestion that the rate is discriminatory or excessive. The Intangible Tax Act spreads the general property tax, which formerly was borne by the tangible property only, over all the property of the state, thereby lessening "the burden in this regard resting upon tangible property." Section 3. "In the judgment of the legislature, the fund charged with the payment of the expenses of the government needed to be replenished" (*People* v. *Supervisors of Orange County, supra*) by the intangible property tax. The power of the legislature to resort to this new source of revenue cannot be questioned.

3. Section 15 of the Intangible Tax Act provides (a) that financial institutions such as banks, building and loan associations, etc., shall return to the tax commission the names and addresses of their stockholders, the number of shares or proportionate interest, and the market value of the shares or interest owned by each; (b) that the commission shall determine and fix the fair value of such stock or other interest, and shall consider the effect thereof, if any, produced by reason of the institution's tangible property, both real and personal, being separately assessed and taxed as tangible property; (c) that such financial institution shall pay the taxes assessed upon its stock or other evidence of ownership, for which it is given a lien thereon; and

"(d) Such taxes shall be in lieu of all other taxes for state purposes on the shares of stock or other evidence of ownership of any such bank or other financial institution, whether in the hands of the individual or otherwise and no tax shall be assessed or levied on the income of the money capital employed in any business taxed under the provisions of this section, any other provision of law notwithstanding."

It is claimed by appellees that the last provision, relieving the owners of the intangibles enumerated from paying an income tax, in effect amends the Income Tax Act, approved June 26, 1933 (chapter 39), one day before the Intangible Tax Act was approved, and violates sections 13 and 14 of article 4, part 2, of the state Constitution, and for that reason the act is void.

Section 13, *supra,* limits each act to a single subject to be expressed in its title. The subject of the Intangible Tax Act is, "Relating to taxation, and to provide for a classified tax on intangible property." The subject appears to be single, and the legislation

complained of is certainly germane to that subject. *In re Miller,* 29 Ariz. 582, 244 Pac. 376; *Black & White Taxicab Co.* v. *Standard Oil Co.,* 25 Ariz. 381, 218 Pac. 139; *Board of Control* v. *Buckstegge,* 18 Ariz. 277, 158 Pac. 837.

Section 14, *supra,* reads:

"No Act or section thereof shall be revised or amended by mere reference to the title of such Act, but the Act or section as amended shall be set forth and published at full length."

The Intangible Tax Act was intended to be a complete, comprehensive and independent piece of legislation concerning the taxation of intangible property and, incidental to that purpose, although not in direct terms, some of its provisions have inevitably and naturally amended, modified or altered some of the existing general revenue laws of the state.

" ' . . . An act of the legislature, not amendatory in character, but original in form, and complete in itself, exhibiting on its face what the law is to be, its purpose and scope, is valid, notwithstanding it may, in effect, change or modify some other law upon the same subject.' [*Warren* v. *Crosby,* 24 Or. 558, 34 Pac. 661.]" *State* v. *Roseberry,* 37 Ariz. 78, 86, 289 Pac. 515, 518. See, also, *Mosher* v. *City of Phoenix,* 39 Ariz. 470, 7 Pac. (2d) 622.

4. It is also claimed by appellees that the Intangible Tax Act is void because it amends, in section 18 thereof, sections 3069, 3070 and 3071, Revised Code of 1928, without setting forth and publishing the same as amended in accordance with the requirements of said section 14 of the state Constitution. The Intangible Tax Act provides a new method of assessing and taxing financial institutions, such as banks, for state purposes, in lieu of the method prescribed by sections 3069, 3070 and 3071, *supra,* and such method is complete in itself. To comply with it, it is not

necessary to look to the old law governing assessment of banks. That the law providing a new method to assess banks, it being complete in itself, impliedly repeals a former law on the same subject, does not bring it within the prohibitions of said section 14, is well settled. (See authorities cited above.)

5. Appellees further claim that subdivision (d) of section 15 of the act (above quoted) ''shows that it exempts banks and financial institutions from the payment of a tax on intangible property owned by them,'' and that such exemption conflicts with section 2 of article 9 of the Constitution. There is a wide difference between a ''lieu tax'' and an exemption from taxation. The ''lieu tax'' is a substituted tax. *Pacific Fruit Express Co.* v. *City of Yuma,* 32 Ariz. 601, 261 Pac. 49. It here applies only to ''shares of stock or other evidence of ownership'' and to ''the income of the money capital employed in any business taxed under the provisions of this section.'' There is no suggestion in the context of subdivision (d) of section 15 that the intangibles of banks and other financial institutions shall not be taxed.

6. It is agreed that the provisions of section 2 of the Intangible Tax Act, excluding from taxation the intangibles of insurance companies which pay a tax upon premium incomes and domestic insurance companies, while including intangibles of all others, violates section 1 of article 9 of the state Constitution, requiring all taxes upon the same class to be uniform.

7. The same may be said of the provisions of section 4 (h), which attempts, in its definition of intangibles, to exclude the assets of insurance companies and the surrender values or payment under policies or contracts issued by said companies.

8. Likewise the attempted exemption in said section 4 (h) of all intangibles of individuals owned, held or

used exclusively for charitable, humanitarian, benevolent, scientific, educational or religious purposes, is in conflict with section 2 of article 9 of the state Constitution which subjects all property in the state to taxation, with certain exceptions which do not extend to property of individuals used for charity, etc. The trial court held, and correctly so, that the exclusions from taxation and the attempted exemptions were beyond the power of the legislature to grant.

9. It is asserted by appellees that, because the tax rates of the Intangible Act are different from those imposed on other property, the act violates the uniformity rule and denies equal protection. In the absence from the law of the classification of property for taxation purposes, the tax rate on all property, tangible and intangible, has heretofore in this jurisdiction been the same. The rule established by the Intangible Act for valuing intangibles is the same as the rule for valuing tangible property; that is, both are to be assessed at their full cash value. Section 8. The rate of levy under the Intangible Act is fixed and varies according to class (section 9), whereas the rate upon tangible property is not fixed, but each year depends upon the factors of the aggregate valuation of the whole property in the taxing district and the amount of money necessary to be raised in addition to other sources of revenue.

Perhaps there is no subject in recent years more discussed by the courts and text-writers than that of classification of property for taxation purposes. The consensus seems to be that classification is not only permissible, when not forbidden by the organic law, but highly desirable. Our Constitution (section 1, article 9) recognizes classification, provided the tax is uniform upon the same class of property within the taxing district. In a great many opinions of the

Supreme Court of the United States and of the state courts, classifications based upon reason and distinction have been approved as in no way contravening the equal protection clause of the Fourteenth Amendment. The sum of such decisions is fairly accurately stated, together with cited cases, in 61 Corpus Juris 126, section 58, as follows:

"The legislature may exercise wide discretion in selecting and classifying the subjects of taxation, and may arrange and divide the various subjects of taxation into distinct classes and impose different rates on the several classes without violating the requirement of equality and uniformity, provided the tax is uniform on all members of the same class, and provided the classification is reasonable and provided it is not arbitrary. However, the legislature must refrain from clear and hostile discrimination against particular persons or classes, and the classification must rest on some ground of difference having a fair and substantial relation to the object of the legislation, or to some permitted end of governmental action."

The federal rule as to classification of property we think is well stated in *Franklin* v. *Carter,* (C. C. A.) 51 Fed. (2d) 345, 346, as follows:

"The principles which govern the application of the equal protection clause to the power of taxation by the states are well settled. Such power is essential to the existence of the government of a state. *State Board of Tax Commrs. of Ind.* v. *Jackson,* 283 U. S. 527, 51 Sup. Ct. 540, 75 L. Ed. 1248 [73 A. L. R. 1464]; *Ohio Oil Co.* v. *Conway,* 281 U. S. 146, 159, 50 Sup. Ct. 310, 74 L. Ed. 775. Such clause does not compel a state to adopt an iron rule of equal taxation; nor require it to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value; nor prevent it from exercising a broad discretion in the classification of properties, businesses, trades, callings or occupations for the purpose of taxation. *State Board*

*of Tax Commrs.* v. *Jackson, supra; Ohio Oil Co.* v. *Conway, supra; Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237, 10 Sup. Ct. 533, 33 L. Ed. 892; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114, 122, 30 Sup. Ct. 496, 54 L. Ed. 688; *Brown-Forman* v. *Kentucky,* 217 U. S. 563, 572, 573, 30 Sup. Ct. 578, 54 L. Ed. 883; *Smith* v. *Cahoon,* 283 U. S. 553, 51 Sup. Ct. 582, 75 L. Ed. 1264.

"However, there is a point beyond which a state cannot go without violating the equal protection clause. While a state may classify broadly the subjects of taxation, in doing so it must proceed upon a rational basis. It is not at liberty to resort to a classification that is palpably arbitrary. The classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons in similar circumstances shall be treated alike.' *Ohio Oil Co.* v. *Conway, supra,* page 160 of 281 U. S., 50 Sup. Ct. 310; *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415, 40 Sup. Ct. 560, 64 L. Ed. 989; *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37, 48 Sup. Ct. 423, 72 L. Ed. 770; *Air-Way Corp.* v. *Day,* 266 U. S. 71, 85, 45 Sup. Ct. 12, 69 L. Ed. 169; *Schlesinger* v. *Wisconsin,* 270 U. S. 230, 240, 46 Sup. Ct. 260, 70 L. Ed. 557, 43 A. L. R. 1224; *Quaker City Cab Co.* v. *Penna.,* 277 U. S. 389, 400, 48 Sup. Ct. 553, 72 L. Ed. 927; *Sneed* v. *Shaffer Oil & Ref. Co.* (C. C. A.) 35 Fed. (2d) 21, 24; *Smith* v. *Cahoon, supra.*"

So we conclude that there is no constitutional prohibition against classifying property for taxation purposes into tangibles and intangibles and levying a different rate upon tangibles than upon intangibles. Nor is there any against subdividing intangibles into classes, as has been done here, and imposing a different rate on each class, provided the same tax is imposed on all members of the class and the classification is reasonable and not arbitrary.

10. Appellees contend that some of the classifications are discriminatory, arbitrary, and unreasonable; also that some of the provisions pertaining to classifi-

cation are so indefinite, uncertain, unintelligible and ambiguous as not to be susceptible of interpretation or construction. These propositions involve sections 7, 8 and 9 of the act, and for convenience we quote them:

"Sec. 7. *Classification of Intangibles.* For the purpose of taxation intangible property shall be classified as follows:

"(a) Class 1. Money (including all notes and securities of the United States or of other governments payable on demand, deposits, gross credits, bills of exchange, letters of credit, checks, drafts, trade acceptances and other evidences of the possession, ownership, or control of money or its equivalent as a circulating medium or medium of exchange and including all money in the hand or under the control of a fiduciary or deposited to the credit of any suit, arbitration or settlement.

"(b) Class 2. Intangible property as defined in subsection (a), belonging to non-residents and deposited or held in Arizona.

"(c) Class 3. Notes, debentures, bonds, securities, solvent credits, liens, judgments, choses in action, contracts, annuities and all other demands and claims, for cash, labor, or other valuable things, however evidenced, whether due or to become due, excepting such as bear a total rate of interest paid or to be paid exceeding eight per cent per annum, or by the laws of the United States or of Arizona are exempted from taxation, or are classified in another subsection.

"(d) Class 4. Notes, debentures, securities, or other evidences of indebtedness bearing a total interest rate paid or to be paid exceeding eight per cent per annum.

"(e) Class 5. Capital of trade or business including bills and solvent credits including notes, liens and judgments taken in lieu of accounts receivable, franchises, good wills, copyrights, patents, trade-marks or other intangible property not otherwise specifically taxed used in the conduct of a trade or business.

"(f) Class 6. Shares of stock of commercial banks, savings banks, and trust companies; paid-in

or prepaid capital stock and non-withdrawable investment shares of building and loan associations; shares of stock or other evidences of ownership or control of investment, security, finance, or other companies engaged in the use of money wherewith to make money, and all moneyed capital so employed, by individuals or otherwise, as to come into substantial competition with the business of banking; provided, that casual, occasional, or incidental evidences of indebtedness representing merely personal investments not made in competition with the banking business or acquired as an incident of ordinary business transactions unrelated to the banking business shall not be classed as nor deemed to be evidence of the employment of moneyed capital within the meaning of this subsection.

"(g) Class 7. Shares of stock of corporations or joint stock companies not included within any other classification. The shares of capital stock of domestic corporations organized or admitted to do business under the laws of this state (except the class of corporations mentioned in section 6 of this act) and all of the business and property of which are situated within this state shall, for the purposes of assessment and taxation be deemed and treated as an interest in the property of such corporations and shall not be taxed, but if any part of the business or property of any such corporation be situated without this state, then its shares of capital stock and bonds shall for the purpose of assessment and taxation be deemed and treated as an interest in the property of such corporation and not be taxed only to the extent that the value of the business and property situated in this state bears to the value of all of the business and property of such corporation.

"Sec. 8. *Basis of Valuation.* The basis of valuation of intangible property shall be the basis employed in the assessment of tangible property that is to say, its full cash or fair market value, which value, except as otherwise specifically provided, shall be arrived at, fixed and determined by the commission, under such rules and regulations as it may prescribe, according to its information and best judgment, and by the employment of such factors, uniform with re-

spect to each class, as to it may seem best adapted to the purpose; provided that indebtedness, incurred in good faith, against a particular intangible, embraced within section 7, class 3, which is the object of the assessment may be deducted from the value thereof; and provided further that accounts payable may be deducted from solvent credits. Fair value of each class of intangible property specified in section 6 this deduction shall [be] allocated to the respective classes in the ratio that the value of each class of intangible asset bears to the total value of all intangible assets before this deduction is made.

"Sec. 9. Rates. The tax to be levied and collected upon intangible property shall be computed at the following rates per dollar of assessed valuation: Class 1, one mill; class 2, one mill; class 3, two and one-half mills; class 4, three mills plus one-half mill for each per cent or fraction thereof per annum which the interest on such intangible property exceeds the rate of eight per cent per annum; class 5, three mills; class 6, twelve mills; class 7, three mills.''

11. Section 7 of the act divides intangibles into seven classes, section 8 gives the rule for valuing intangibles, and section 9 gives the rate to be assessed and collected upon the several classes. It is said that classes 3 and 4 are, in at least two respects, discriminatory and arbitrary; that intangibles in class 3 are favored over all other intangibles, since section 8 provides "that indebtedness, incurred in good faith, against a particular intangible, embraced within section 7, class 3, which is the object of the assessment may be deducted from the value thereof.''

Intangibles in class 4, or any other class, are not allowed this deduction. To illustrate: If A borrows from his bank $8,000, giving his 8 per cent. note therefor secured by collateral worth $10,000, he would pay taxes only on $2,000, whereas, if B should borrow from his bank $8,000, giving his 8½ per cent. note therefor secured by collateral worth $10,000, he would

get no deduction, but would pay taxes on $10,000. Immediately following the provision allowing deduction of the amount of a good-faith debt incurred against a particular intangible is the further provision to the effect "that accounts payable may be deducted from solvent credits."

" 'Accounts payable' are contract obligations owing by a person on open account; and 'bills payable' are all other contract obligations owing by a person." *West Virginia Pulp & Paper Co.* v. *Karnes,* 137 Va. 714, 120 S. E. 321, 323.

While accounts payable may be deducted from solvent credits, bills payable may not. So, construing the two provisions together, if the debt owing is an open account, it may be deducted from solvent credits; if it is not an open account, it can be deducted only from the particular intangible against which it was incurred. The only apparent reason, or the only one that we can think of, for this discrimination, is that one intangible bears 8 per cent. or less, whereas the other bears more than 8 per cent. This difference, it seems to us, affords no reasonable or fair basis for the discrimination. As said by Mr. Justice BRADLEY, in *Bell's Gap Railroad Co.* v. *Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892, 895, the state "may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them."

However, if deductions of indebtedness are allowed, it seems to us they should be allowed to all taxpayers and not to some of them. We recognize the rule as stated in *Commonwealth* v. *Delaware Div. Canal Co.,* 123 Pa. 594, 16 Atl. 584, 588, 589, 2 L. R. A. 798, as follows:

"The selection of the subjects, their classification, and the methods of collection are purely legislative matters. When the action of the legislature with respect to these matters is not repugnant to the constitution, it would certainly be a case of the grossest inequality which would call for the intervention of the courts. . . . Absolute equality is of course unobtainable; a mere approximate equality is all that can reasonably be expected. . . . Nor is classification necessarily based upon any essential difference in the nature, or indeed in the condition, of the various subjects. It may be based as well upon the want of adaptability to the same methods of taxation, or upon the impracticability of applying to the various subjects the same methods, so as to produce just and uniform reasonable results, or it may be based upon well-grounded considerations of public policy. Hence it is that some classes of corporations are taxed upon net earnings or income; others upon capital stock, the value thereof to be ascertained by their annual dividends, or, in a certain event, upon the actual value of the shares; others upon their gross receipts; insurance companies upon the gross amount of their premiums; coal and mining companies at a specific sum for every ton of coal mined, etc. . . . Illustrations might be multiplied to show that classification does not depend upon differences in the physical natures or conditions of the subjects selected, but upon a variety of considerations."

It does not appear to us that any of the reasons here suggested as a ground for classification are apparent in the allowance of deductions of indebtedness to one taxpayer and not to others.

12. It will be observed that classes 3 and 4 cover the same intangibles, but that those bearing 8 per cent. or less interest are placed in class 3 and taxed at the rate of 2½ mills per dollar on assessed valuation, while those bearing more than 8 per cent. interest are placed in class 4 and pay 3 mills where the interest is over 8 per cent. and less than 9 per cent.; 3½ mills where the interest is over 9 per cent. and

less than 10 per cent.; and so on. If the tax were upon the nominal or face value of the intangible, and not upon its assessed valuation, it might be said that a higher rate on intangibles bearing more than 8 per cent. than on those bearing 8 per cent. or less was justified, on the theory that the income upon the former would or might be greater than on the latter. But both are required to be assessed at their full cash value, and of course, in arriving at that value, the assessing body takes into consideration many factors, including the rates of interest they bear. If the maker of the instrument is responsible, the higher rate of interest increases its value; if not responsible, or if it is poorly secured, its value would be lessened. Both must pay upon the assessed valuation, which seldom depends upon the rate of interest it bears. The legal rate of interest in Arizona is 8 per cent. per annum. If more is contracted, no interest can be collected, and a party voluntarily paying interest at a higher rate can claim such payment as a credit upon principal. Chapter 44, Laws of 1933. So far as domestic intangibles are concerned, those bearing 8 per cent. or less are more valuable than those bearing more than 8 per cent., if the factor of interest only be considered. The only reason for imposing higher rates on intangibles in class 4, it seems, is to discourage usury, but that is hardly justifiable in legislation whose sole object is to raise revenue to support the state government.

13. The different rates of taxes on intangibles in class 4 violate the uniformity rule of the Constitution providing that "all taxes shall be uniform upon the same class of property." Section 1, art. 9. Class 4 includes those intangibles enumerated in class 3 bearing "a total rate of interest paid or to be paid exceeding eight per centum per annum." After thus

placing intangibles bearing more than 8 per cent. interest in a class for taxation purposes, the act proceeds to impose a different rate upon the intangibles in that class; in other words, in effect, it subdivides class 4. Although this violates the letter of the uniformity rule, it might be permitted if such classification was based upon any substantial reason, but, as we have already seen, the rule of assessing intangibles at their full cash value precludes their being taxed on the basis of the rate of interest they bear. It appears to us that the division of intangibles in class 3 into two classes, for the reason that some of·them may bear 8 per cent. interest and some of them more than 8 per cent., and imposing on the latter a higher rate of taxation is more fanciful than real and .in fact arbitrary. . It may be suggested that the discrimination is inconsequential and should be overlooked, but we do not think that is material. The question is, Can discrimination be allowed as between property in the same class? If permitted where the discrimination is slight, when shall it be denied?

14. The shares of the capital stock of financial institutions, or institutions using money to make money, are placed in class 6, section 7. Shares of stock of corporations not included in class 6, or any other classification, are placed in class 7 of said section, although appellees dispute this, and contend that the language describing intangibles of class 7 covers shares of stock of domestic corporations only. From the context in which the language is used, we think it was intended by the legislature to cover shares of stock of both domestic and foreign corporations. It includes the shares of stock of corporations organized under the laws of the state and the shares of stock of corporations admitted to do business under the laws of the state. The word ''domestic'' might well be

omitted, and the phrase would then read "shares of capital stock of corporations organized or admitted," etc. Foreign corporations are required to "obtain . . . a license to do business in this state" (section 657, Rev. Code 1928), whereas domestic corporations need not do so.

But the real and perplexing controversy is over the meaning of subdivision (g), class 7, section 7, as a whole. Appellants say:

"What this section (subdiv. (g) class 7) really does is to provide that, where a corporation has property ·within the state which is taxed, its stock shall be taxed to the extent only of the value of its property without the state. In other words, it prevents both the property within the state and the stock representing it from being taxed and thus prevents double taxation. There is no exemption."

Appellees, to the contrary, say:

" . . . The only construction that can be placed on the last part of Class 7 is that stock of domestic corporations which own business and property in this state and business and property out of the state shall be taxed to the extent that the .value of the business and property situated in this state bears to the value of all of the business and property of such corporation—that is to say, if a domestic corporation owns no property in a foreign state, then .its shares of stock shall be taxed in the amount of the value of the property owned by it in this state."

Before we seek aid from the rules of construction, the inquiry is, What was the intent of the legislature as gathered from the language used? If that can be found in the language, we should go no further. We have no right or power to say the legislature did not mean what it plainly says, because, perchance, it leads to unexpected or absurd results. If the meaning of the language is doubtful, then it should be given a construction, if possible, that will reconcile

it with the general purposes of the act. With these rules in mind, we examine the language of said subdivision (g) with a view of determining therefrom, if we can, the intent of the legislature. In other words, is the intent plainly expressed, or is it doubtfully expressed? We interpret its meaning to be that the capital stock of a corporation of the character therein described, when all of its tangible property and business are located in the state, shall not be taxed but that the property shall be taxed. However, if any part of its property or business is located outside of the state, then its capital stock and bonds "shall . . . not be taxed only to the extent that the value of the business and property situated in this state bears to the value of all of the business and property of such corporation"; that is, if such corporation has property or business outside of the state, it will be required to pay taxes on its shares of capital stock and bonds proportionate to the value of its business and property in the state. In the one case it pays taxes upon its property and in the other upon the shares of stock equal to the percentage of the property located in the state. We have no doubt this is what the legislature intended. If all the business and property appertaining thereto are in the state, the *res* is taxed. If part of the business or property is located without the state, the stock representing the proportion of the assets in this state is taxed.

The result in practice of this rule of assessing and taxing the stock of foreign corporations whose business and property are in part in Arizona and in part elsewhere would be to leave the tax commission powerless to collect the tax, since the tax is against the stock, and not the corporation's tangible property. The law does not make it the duty of the corporation

to pay such tax and charge it against the owner of the stock, as in the case of financial institutions, and, since none of the owners might be a resident of the state, the property would escape taxation. If the act provided for the taxing of the corporation's tangible property in Arizona, as probably was intended by the legislature, although not expressed, the collection of the tax would be easy. Under the method actually provided, it may not be collected at all. The result is that property of the same class would not be uniformly taxed.

15. By section 16 of the act, financial institutions, including building and loan associations, are required to pay the taxes upon paid-up nonwithdrawable investment stocks or certificates, and are authorized to prorate such taxes against the shares of paid-in, prepaid capital stock or other capital stock of such institution or association, and the institution or association paying the tax is given a lien on the capital stock thereof, but may not charge the tax against the property of the owner. We agree with the appellee and the trial court that the tax should be paid by the owner of the investment stock, and that the placing of the burden of paying such tax upon the property of others is a violation of the due process clause of the Fourteenth Amendment.

16. In so far as section 18 of the act undertakes to tax the tangible personal property of national banks, it contravenes section 5219, Revised Statutes of the United States, as amended March 25, 1926, chapter 88, 44 Stat. 223 (section 548, title 12, U. S. C. A.). This section permits the state to tax the shares of stock and the real property of national banks, but not their tangible personal property.

17. The intangibles mentioned in (b) class 2 of section 7 of the act are money and money equivalents

belonging to nonresidents and deposited or held in Arizona. Intangibles of the kind enumerated follow the domicile of their owner, and are taxable only in the state of the owner's domicile, except, perhaps, where such intangibles are so used in this state as to give them "a situs analogous to the actual situs of tangible personal property." *First Nat. Bank* v. *Maine,* 284 U. S. 312, 52 Sup. Ct. 174, 178, 76 L. Ed. 313, 77 A. L. R. 1401; *Baldwin* v. *Missouri,* 281 U. S. 586, 50 Sup. Ct. 436, 74 L. Ed. 1056, 72 A. L. R. 1303; *State Tax Com. of Arizona* v. *Board of Supervisors,* 43 Ariz. 156, 29 Pac. (2d) 733; *Yuma County* v. *Arizona & Swansea R. Co.,* 30 Ariz. 27, 243 Pac. 907; Cooley on Taxation, 4th ed., vol. 3, § 1113.

18. We have not found the act in its main features so indefinite, unintelligible and ambiguous as not to be capable of enforcement. The last five lines of section 8 are a jumble of words conveying no meaning, but they may be deleted without affecting other provisions of the act. There is unmistakable evidence in the act that its several provisions come from different sources, such as the basis of valuation. After stating in section 8 that the basis of valuation of intangibles shall be their "full cash or market value," in subsequent provisions "fair value" is made the basis; and in (d) section 17 the basis of value of investment stock or credits is made the amount the owner, contractee or purchaser would receive in the event of withdrawal, or, if not withdrawable, then book, value. The rule of valuation of all intangibles in the same class should be the same to comply with the uniformity provision of the Constitution. Stocks and contracts in investment companies are but choses in action, and their value is dependent upon the financial responsibility of the company issuing them, and not on their book value.

In section 19 (a), the amount of the tax to be paid is computed upon the face value of the return made by the taxpayer and not upon the full cash value as determined by the commission, as the act in other provisions requires.

19. Whether the invalidity of certain parts of the act goes to the whole act and destroys it, it is not necessary to decide, since, at all events, the act must fail, lacking, as hereinafter stated, the feature of due process.

20. Finally, it is contended by appellees that the act is fatally defective because it denies to the taxpayer due process, in that it fails to give or allow him an opportunity to be heard at any stage of the taxing process. We might ignore this point since it is not in the pleadings, but to do so would only postpone it to a future date when properly raised in another proceeding. The Attorney General in his brief in behalf of appellants makes note of this situation, and states: ''Since we are desirous that all possible questions relating to the validity of the intangible tax act be determined here, we raise no objection as to the propriety of these issues''; that is, issues not raised by the pleadings. In view of the great public interest involved, we accede to the wishes of both parties, as expressed in their briefs, so that corrective legislation, if thought advisable, may be enacted. A careful examination of the Intangible Tax Act fails to disclose any provision giving the taxpayer an opportunity to be heard as to the amount of his tax before it is finally determined, except in the one instance of omitted property as provided for in section 23 of the act. In all other cases his property is valued and assessed without any opportunity to him to be heard. The rules with reference to notice

and hearing are well stated in *Clark* v. *City of Burlington,* 101 Vt. 391, 143 Atl. 677, 685, as follows:

"Where a statute itself makes an assessment of property for purposes of taxation, the tax being recoverable by suit, it is not required, in order to constitute due process of law, that any other notice than that contained in the statute be given the taxpayer. *Clement National Bank* v. *Vermont,* 231 U. S. 120, 143, 34 Sup. Ct. 31, 58 L. Ed. 147, 158; *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892, 895. 'But where the Legislature . . . commits to some subordinate body the duty of . . . making its assessment, . . . due process of law requires that at some stage of the proceedings before the tax becomes irrevocably fixed, the taxpayer shall have an opportunity to be heard, of which he must have notice, either personal, by publication, or by a law fixing the time and place of the hearing.' *Londoner* v. *Denver,* 10 U. S. 373, 385, 28 Sup. Ct. 708, 714, 52 L. Ed. 1103, 1112; *Turner* v. *Wade,* 254 U. S. 64, 68, 41 Sup. Ct. 27, 28, 65 L. Ed. 134.

"In *McGregor* v. *Hogan,* 263 U. S. 234, 237, 44 Sup. Ct. 50, 51, 68 L. Ed. 282, it is said:

" 'It is not essential to due process of law that the taxpayer be given notice and hearing before the value of his property is originally assessed; it being sufficient if he is granted the right to be heard on the assessment before the valuation is finally determined. . . . The requirement of due process is that after such notice as may be appropriate the taxpayer have opportunity to be heard as to the amount of the tax by giving him the right to appear for that purpose at some stage of the proceedings before the tax becomes irrevocably fixed.' "

Section 3136, Revised Code of 1928, provides that, after a tax has been paid to the county treasurer, the taxpayer may maintain an action to recover any taxes illegally collected, but this section is not applicable here, for the reason that the taxes are not paid to the county treasurer but to the state tax commission. For the same reason the review by the

courts of an assessment as provided in section 3065, Id., is not available.

Since the act accords no opportunity to the taxpayer to be heard, he is denied due process, and the whole act must fail.

LOCKWOOD and McALISTER, JJ., concur.